# Exhibit A

*2000 New*
*interlocal*
*#0975*

# INTERLOCAL AGREEMENT BETWEEN
# KING COUNTY AND THE CITY OF BURIEN
# RELATING TO LAW ENFORCEMENT SERVICES

This is an Interlocal Agreement between King County, a home rule charter county, a political subdivision of the State of Washington, hereinafter referred to as the "County", and the City of Burien, a municipal corporation of the State of Washington, hereinafter referred to as the "City".

WHEREAS, a number of cities in King County contract with the County for the provision of law enforcement services within their City boundaries, and

WHEREAS, the County has adopted policies that support the development and continuation of these contracts to preserve the quality, depth and breadth of its law enforcement services, and

WHEREAS, the King County Sheriff's Office (KCSO) acts on behalf of the City, which is responsible for law enforcement services within its jurisdiction; and

WHEREAS, the County and the contract cities recently completed negotiating a new interlocal agreement for 2000 and beyond, which embodies the following principles adopted by County Council Motion 9540:

1. County law enforcement employees should feel responsibility toward and demonstrate responsiveness to cities with agreements for law enforcement services.
2. Each city should have the flexibility to determine the level and deployment of certain services and to identify service priorities, thereby controlling costs.
3. Each city should have the ability to choose unique police uniforms and markings for police vehicles assigned to the City.
4. County law enforcement employees should work cooperatively with city organizations in a problem-solving mode to improve the safety and welfare of city residents and visitors.
5. The County should provide at a reasonable and predictable cost, efficient, high-quality, appropriate law enforcement services supported by technology that furthers the goals of each city and the County.
6. The contracts and service agreements should maintain equity among the interests of city and unincorporated area residents.
7. The agreements should preserve, to the extent practical, the valuable law enforcement services provided by the KCSO, while providing a high level of local service and decision-making.

NOW, THEREFORE, pursuant to RCW 39.34, the County and the City hereby agree:

1. <u>Law Enforcement Services.</u> The County will make available to the City any of the law enforcement services listed in Exhibit A, "King County Sheriff's Services" (Exhibit A), which is incorporated herein by reference.

   1.1. <u>Precinct/City Services.</u> Precinct/city services consist of law enforcement and other related services provided by personnel assigned to a police precinct primarily for the benefit of the geographic areas within the boundaries of the precinct except as may be modified by Section 2. Precinct/city services include:

   1.1.1. Reactive patrol to enforce state law and City-adopted municipal, criminal, and traffic codes and to respond to residents' and business' calls for service;

   1.1.2. Proactive patrol to prevent and deter criminal activity;

   1.1.3. Traffic patrol to enforce applicable traffic codes;

   1.1.4. Precinct detectives to investigate local crimes such as burglary, vandalism and auto theft;

   1.1.5. Community service and community crime prevention deputies;

- 1 -

1.1.6.   Drug Awareness Resistance Education (DARE) deputies;

1.1.7.   Precinct command and support staff; and

1.1.8.   Police reserves to perform a variety of routine police patrol functions.

1.1.9.   For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that precinct command staff shall not be required if the City opts to provide its own precinct under Section 6.4.

1.2.   Support Services. Support services consist of:

1.2.1.   Investigation services by deputies assigned to a central criminal investigation unit investigating such crimes as major crimes, drug offenses, fraud and such reports as missing persons, vice, and major accidents. These deputies are supported by crime scene analysis, crime laboratory, polygraph, identification, and evidence control.

1.2.2.   Special operations services such as canine patrol, hostage negotiations, tactical unit, and bomb disposal; and

1.2.3.   Communications services, including call receiving, dispatch, and reports.

1.2.4.   For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that hostage negotiation and bomb disposal may be provided by City deputies under the city department model described herein.

1.3.   Administrative Services. Administrative services include legal advisor, planning and statistics, subpoena control, training, weapons permits, accounting, payroll, personnel, labor relations, media relations, fleet control, radio maintenance, purchasing, records, inspections/internal investigations, and other services provided by other County Agencies in support of the KCSO. Such services do not include legal services of the King County Prosecuting Attorney relating to enforcement of municipal criminal and traffic codes or prosecutions arising thereunder.

1.3.1.   For purposes of this agreement, administrative services shall be required, except as otherwise noted in Exhibit A, which is incorporated herein by reference.

2.   City Department, Shared Supervision and Flexible Services Models. Law enforcement services provided to the City under this agreement shall be available to the City under a city department model, a shared supervision model, or a flexible services model, provided that the City must select any service that is required in accordance with Exhibit A.

2.1.   City Department Model. Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee.

2.1.1.   Such positions shall be assigned to the City and shall be dedicated to work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

2.1.2.   The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

2.1.3.   Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

- 2 -

2.1.4. Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.2. <u>Shared Supervision Model.</u> Under the shared supervision model, the level, degree and type of precinct/city direct services (e.g., reactive patrol, precinct detectives, and City administrative sergeants) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. Precinct command and supervision shall be shared by the County and the City.

2.2.1. Such precinct/city direct services positions shall be assigned to the City and shall work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

2.2.2. The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

2.2.3. Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

2.2.4. Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.3. <u>Flexible Services Model.</u> Under the flexible services model, base level law enforcement services will be provided to the City in proportion to the City's share of workload, unless the City enhances services as provided for herein or unless the City opts to provide its own precinct under Section 6.4.

2.3.1. Positions designated to provide precinct/city services to the City shall be dedicated to work within the precinct in which the City is located, subject to responses to assist another jurisdiction or KCSO precinct according to mutually agreed-upon written criteria.

2.3.2. Additional precinct/city services may be purchased at the discretion of the City and will be used in accordance with mutually agreed-upon protocols.

2.3.3. Additional support services may be purchased by the City for the sole benefit of the City, with the exception of any support service that is required in accordance with Exhibit A.

3. <u>City Law Enforcement Services.</u>

3.1. <u>2000 City Law Enforcement Services.</u> Beginning January 1, 2000, the County agrees to provide to the City the level, degree and type of precinct/city and support services in accordance with Exhibit B, "Financial Exhibit" (Exhibit B), along with related administrative services.

3.2. <u>Revisions to City Law Enforcement Services.</u> In 2001 and thereafter, revisions to City law enforcement services shall be made in accordance with Section 4.

4. <u>Compensation.</u>

4.1. <u>Development of Service Costs.</u> The County shall develop service costs for each precinct/city, support, and administrative service provided by the KCSO .

4.1.1. Service costs shall include, but not be limited to, salary, benefits and special pays, if any, for personnel providing the service, along with any associated clothing allowance, quartermaster, overtime, supplies, services, telephone, motor pool, lease cars, systems services, insurance, equipment and associated administrative costs. If not already included, costs shall include

- 3 -

adjustments for cost-of-living and inflation.

4.1.2.  Service costs shall not include the cost of services that are required by state law, provided only within unincorporated King County, or supported by a dedicated revenue source, and services excluded from cost allocation at the discretion of the County. For the purpose of the agreement, such services and their associated administrative costs shall be considered non-chargeable.

4.1.3.  Service costs shall reflect the deduction of revenues.

4.2.  Development of Unit Costs. The County shall develop unit costs for each precinct/city and support service based on service costs developed in accordance with Section 4.1. Unit costs are listed in Exhibit A.

4.3.  Calculation of City's Estimated Agreement Amount. Service costs and unit costs shall be the basis for calculating the City's estimated agreement amount. The City shall be charged for services on the basis of FTE's (full-time equivalents) or workload billing factors as outlined in Exhibit A.

4.4.  City's Estimated Agreement Amount. The estimated agreement amount is shown in Exhibit B. The County agrees to revise this amount annually following the King County Council's adoption of the Annual County budget. The County will provide the City by March of the year for which the budget has been adopted a revised estimated agreement amount, if it is less than the amount shown in Exhibit B.

4.5.  Mid-year Adjustment. Mid-year supplemental appropriations requested by the City will be reflected as adjustments in the current year estimated agreement amount.

4.6.  Billing. The estimated agreement amount shall be billed monthly in 12 equal amounts. Payments shall be due within 30 days after invoicing by the County.

4.7.  Revisions to City Law Enforcement Services and Agreement Amount. Beginning in 2000, by September 1, or the first working day thereafter, the County shall provide the City with an estimate of the subsequent year's unit costs and service data in the form of a revised Exhibit A and an estimate of the City's agreement amount for the same level of service for the subsequent year in the form of a revised Exhibit B. By September 15, or the first working day thereafter, the City shall notify the County of any changes in service or model for the subsequent year. By October 5, or the first working day thereafter, the County shall provide the City with the estimated agreement amount for the subsequent year based on the changes in service requested by the City, along with revisions to Exhibit B.

4.8.  Limit on Annual Growth for Selected Expenditures. A cap on growth in charges shall be in place for the sum of the following group of items: quartermaster, supplies, services, telephones, capital, system services, printing, central county support services, insurance, and motor pool, except for vehicle purchase and fuel. The annual growth in the sum of these costs per FTE shall not exceed the growth in the previous July to June Urban Wage and Clerical Workers Index for greater Seattle. All other charges, including but not limited to any costs related to existing contractual obligations or labor contracts currently in negotiations, binding arbitration requirements, federal or state court mandates, federal or state law requirements, recommendations of the Oversight Committee that have a fiscal impact and are approved by the County, or any other costs determined by the full Oversight Committee to be beyond the County's control, shall not be subject to this cap.

4.9.  Reports. The City will receive a monthly Overtime, Salary, Special Pay and Benefits Report that will include current and year-to-date expenditures for overtime, salary, special pay, and benefits. The report will provide a comparison between the actual expenditures and budgeted amounts based on the adopted March Cost Book and exhibits for the previous calendar year. The City will also receive monthly vacancy reports.

4.10.  Application. The City hereby agrees to pay for discretionary overtime expenses separately. Only

- 4 -

dedicated police and dedicated support staff overtime, salary, special pay, and benefit costs are covered by this section.

4.10.1. The City agrees to pay for actual overtime, salary, special pay, and benefit costs.

4.10.2. If the City has a population of under 20,000 and exceeds its budgeted amount for overtime, special pay, salaries, and benefits by more than five percent, it will have the option to pay the amount exceeding five percent over the subsequent two years. At least 50 percent of the balance must be paid in the second year after the overage occurs. The City is responsible for paying the overage that does not exceed five percent in the first year.

4.10.3. Upon termination of an Interlocal Agreement between the City and the County, the City is obligated to pay all incurred overtime, special pay, salaries, and benefits overage costs by the termination date.

4.11. Reconciliation. Annual adjustments will be made in March of each year in such a way that if the City has a positive balance at year-end of the previous calendar year, it will receive a credit, and if the City has a deficit, it will receive a debit in the subsequent monthly billing. All computations will be based on actual overtime, salary, special pay, and benefits costs.

4.12. Computation. The cost formula shall be calculated by totaling the actual costs of overtime, salary, special pay, and benefits of the City and reconciling that figure to the City's budgeted amount. The annual adjustment process would occur as described in Section 4.11.

4.13. Discretionary Overtime. It is the intent of the City and the KCSO to provide operational overtime when requested for special events, dignitary protection and unusual occurrences. Overtime, when requested in these categories, will be billable at the actual overtime rate of the deputy(s) working. Responses to events listed below are treated as if the event were occurring in any other jurisdiction, with the responsibility falling on that jurisdiction.

4.13.1. If the City requests and utilizes KCSO deputies on overtime for special events within the City, the actual deputy overtime expenditure will be billed to the City following the event. This billing will occur with the standard monthly billing, in accordance with Section 4.6. Examples include, but are not limited to, park patrol, parades, and community events.

4.13.2. If the City experiences a disaster or unusual occurrence that is confined within its boundaries and officer overtime is requested by the City Police Chief to stabilize the situation, the actual overtime expenditures will be billed only if disaster relief reimbursement funds are not approved. Examples of this include, but are not limited to, a plane crash, riot, or union strike.

4.13.3. In the case of a County, State, or National declared disaster for which overtime is required to manage the event, the overtime expense will be billed to the appropriate agency (e.g., FEMA). If reimbursement for overtime is not granted, then the City will be responsible for the direct overtime expense, less any mutual aid provided. Examples of this include, but are not limited to, flooding, windstorms, and sink holes.

4.13.4. In the event a dignitary requiring federal, state, or local protection visits a City, the City will determine if additional police response is needed. The City Chief Executive Officer, in consultation with the City Police Chief, will establish the level of service to be provided.

4.13.5. The KCSO Special Operations Section provides dignitary protection when the dignitary arrives in the County and assists in escorting the dignitary to the City. If the dignitary detail includes the US Secret Service, other Federal Government Agencies, or KCSO Special Operations, then the City is not responsible for expenses related to that detail. City expense is confined to meeting the City's established level of service for the dignitary visit, if overtime is incurred. Examples of dignitary protection services include, but are not limited to, traffic and crowd control related to visits from the Office of the President of the United States and foreign dignitaries.

-5-

4.13.6. Billing Process: The City Police Chief will accumulate and code all special event overtime forms. The original form will be routed to payroll and a copy forwarded to the Contract Unit for billing preparation.

5. Decisions and Policy-Making Authorities. The County will provide the services identified in Exhibit B in accordance with the following:

5.1. Operational Decisions and Policy-Making Authorities. The respective authorities of the City and the County to make operational decisions and develop and implement policies shall be governed by the guidelines contained in Exhibit C, "Roles and Responsibilities of Contract Service Personnel" (Exhibit C).

5.2. City Police Chief. The City may designate a county officer assigned to the City to act in the capacity of the police chief, consistent with the guidelines contained in Exhibit C.

6. Special Provisions.

6.1. Use of Non-Sworn Personnel. The City and the County intend to increase the use of non-sworn personnel, and the parties agree that the following functions and positions, among others, can be considered by the Oversight Committee for civilianization: parking enforcement; warrant service; court liaison; crime scene technician; evidence transport; background investigations; records management; crime prevention; accident scene traffic director; missing children services; lost property services; vacation house checks; business watch; permitting; fingerprinting; abandoned vehicle tagging; park patrol; and prisoner transport.

6.2. City Purchases. As an alternative to using the County's routine supplies and equipment, the City may purchase routine supplies or purchase or lease any equipment for its own use, provided that prior written approval is obtained from the County and the equipment can be integrated into applicable County systems. Routine supplies and equipment include, but are not limited to, paper, copying machines, cellular telephones, and office furnishings. In the event the City has received County approval to purchase and/or lease any of these or similar items for its own use, the County will delete from the City's contract amount the full county charge for any items that otherwise would have been provided by the County. The County will not approve items it can provide at an equal or lower cost or that are not standard issue.

6.3. Hourly Charges for Optional Support Services. To the extent the City does not select one or more support services designated as optional, the County will not charge the City for those services. In the event that any of these services are deployed at the request of the City's Police Chief or his/her designee with the appropriate authority, the City agrees to pay the County for the service based on the hourly charges contained in Exhibit E, "Hourly Costs For Selected Services" (Exhibit E). The County intends to apply these charges to other jurisdictions, regardless of whether the jurisdiction has an agreement with the County for law enforcement services.

6.4. City Police Facility. A City that selects either a city or shared supervision model department may purchase or lease its own facility and provide for the operation and maintenance of said facility. The facility must meet or exceed all applicable city, state and federal codes and requirements. The facility must also adequately meet the space and security needs of permanently assigned KCSO personnel. The City will be responsible for all charges associated with the planning, design, construction, and/or renovation of the facility and property.

6.4.1. If the City provides a full-function police precinct as defined in Exhibit F, "Glossary of Terms" (Exhibit F) for all precinct personnel serving the city, the County will delete all applicable support, facilities, operation, and maintenance costs for city-assigned personnel. If the City provides city police facilities that otherwise meet the full definition of a police precinct but house fewer than all precinct personnel serving the city, the County agrees to negotiate on a case-by-case basis an equitable reduction of charges to the City. This reduction

- 6 -

EXHIBIT A -- PAGE 6

of charges to the City shall equal the contract charges for facilities, support, operations and maintenance for the personnel housed in the city facility. In all cases, plans and cost adjustment for city police precincts, support and operations must be negotiated and agreed upon in writing in advance, and payment for police services must remain current within 30 days of billing by the County.

6.5. Use of City Facility by County. There may be situations when the County needs to lease space for personnel serving unincorporated King County from the City. When this situation occurs, the County and the City may choose to negotiate for the use of a city facility on a case-by-case basis.

6.6. Refund of Accrued Replacement Reserves. If the City has reimbursed the County for the initial purchase of any equipment prior to this agreement, or if the City has purchased equipment under the provisions of Section 6.2, and if the City chooses to terminate this agreement, the County agrees to refund to the City any accrued replacement reserves, and any accrued market rate interest, on such equipment, including vehicles, and transfer ownership of such equipment from the County to the City.

6.7. · Exclusion of Replacement Charges for 800 MHz Radios. If the City or County chooses to terminate this agreement, the County agrees to transfer ownership of that number of radios determined to have been purchased by the 800 MHz Levy from the County to the City. The City agrees to assume .responsibility for any service costs associated with continued use of the radios on the regional 800 MHz radio system, including the cost of subscriber access, reprogramming, and maintenance. All other police 800 MHz radios used in the City will revert to County ownership. The cost of additional radios shall be borne by the City.

6.8. Observation of Labor Negotiations. The City may participate with other cities that contract with the County for law enforcement services to select no more than two representatives to observe labor negotiations between the County and the collective bargaining units representing the employees of the KCSO, provided that such observers adhere to rules established by the County and the bargaining units for the negotiations.

6.9. Stabilization of Personnel. The County will coordinate transfers to minimize the time positions are vacant, as well as the impact of vacancies to cities.

6.9.1. Deputies who have been with the City for less than 24 months will not be granted a lateral transfer except with the concurrence of the City Chief Executive Officer.

6.9.2. Timing and replacement of city-assigned staff who are promoted to a position outside the city will be managed with the concurrence of the City Chief Executive Officer.

6.10. Assignment of Detectives. At the request of the City and to the extent feasible, as determined by the KCSO in consultation with the City members of the Oversight Committee, the County shall assign to the precinct incorporating the City detectives from the KCSO Criminal Investigation Division, with the exception of detectives in the Major Crimes Unit of the division.

6.11. Additional Training. The City may provide training for City precinct detectives to perform criminal investigations for any optional criminal investigation services. The cost of any such training shall be borne by the City.

6.12. Cost Effect of Service Decisions. The City's costs shall not be raised as a result of another city's decision regarding the level or makeup of services. The County reserves the right to eliminate services to fulfill this provision.

6.13. Requests for Support Services. The City Police Chief or his/her designee shall have the authority to request any support service provided to the City. If such request is denied, the commander in charge of the support service shall review the decision and provide a report to the City Chief Executive Officer regarding the final determination.

6.14. City Identification. The City may select unique insignia and/or colors for uniforms and/or vehicles used by the deputies assigned to the City, provided that some form of the KCSO logo is retained on

- 7 -

the uniforms and vehicles. To the extent that the annual quartermaster allowance exceeds the costs of routine replacement of uniform items, the allowance shall be applied to the costs of adding the insignia to the uniforms or replacing the uniforms with alternative uniforms. Additional costs related to the uniforms shall be borne by the City. However, whenever an officer leaves the City, either at the initiative of the County or of the officer, within 24 months or less after the assignment to the City, and the cost of outfitting the replacement officer in the City exceeds the City's annual quartermaster allocation, then the City and the County shall split the cost equally. The uniforms will be pooled by the KCSO quartermaster and reissued to new or existing City deputies. The City will retain items that were specially purchased by the City (e.g., bicycle uniforms). Each City is allocated a quartermaster budget calculated by multiplying the number of dedicated sworn personnel by the quartermaster cost per FTE as calculated in the costing book each year. If, at the end of the year, the City goes over its allocated quartermaster budget due to the additional cost of City-specific uniform items, those additional costs will be billed in the following year.

6.15. Start-up Costs. The City agrees to reimburse the County for salary and benefit costs incurred toward hiring deputies in the year prior to their being assigned to the City. These costs further described in Section 4.1 herein, shall be added to the total costs billed for year the deputies are assigned to the city and paid by the City according to this agreement.

6.16. Asset seizure. The KCSO Drug Enforcement (DEU) and Vice Units shall be the seizing entities for any asset seizure and forfeiture investigations involving drug-related offenses in violation of the Uniform Controlled Substances Act (RCW 69.50.505), violations of the Legend Drug Act (RCW 69.41), violations of the Money Laundering Act (RCW 9A.83), and/or any additional criminal or civil seizure statutes that may be applicable currently or in the future related, initiated by the City within its jurisdiction, or other cases initiated pursuant to asset seizure laws and under this agreement.

6.16.1. The terms of this agreement apply to seizures and forfeitures that result from investigations initiated by, or with significant participation by, the City, regardless of whether the City contracts for DEU or Vice services.

6.16.2. Seizures and forfeitures not initiated by, and without significant participation by, the City, are not covered by this agreement, and the City will not be provided a share of any forfeited funds.

6.16.3. If there is a dispute as to the City's share of any forfeited funds, the person in charge of the DEU or Vice Unit and the City Police Chief will meet to attempt to resolve the matter. If this process does not result in a mutually-agreed upon resolution, the dispute will be handled in accordance with Sections 16 and 17 of this agreement.

6.16.4. The KCSO will be responsible for gathering the proceeds from all relevant sales, for accounting for all seizures and forfeitures in conjunction with the personal and real property encompassed under the agreement, for submitting the 10 percent to the State of Washington in accordance with RCW 69.50.505 or making any other mandatory disbursement under the applicable statutes, and for distributing the remaining funds -- in equal shares -- to the parties. This distribution of remaining funds will occur after the KCSO has deducted any and all costs incurred related to the seizure and forfeiture. The final accounting of the seizure and distribution of funds will accompany the check the County writes to the City.

6.16.5. Any properties, real or personal, forfeited to the KCSO pursuant to this agreement will be sold in accordance with RCW 69.50.505.

6.16.6. Any funds distributed to the City will be used in accordance with RCW 69.50.505(i). By signing this agreement, the City acknowledges that it is solely responsible for familiarizing itself with the authorized use of forfeited funds as stated in the applicable RCW Chapter. If the City uses forfeited funds in a manner contrary to the seizure statutes, the County may terminate the asset forfeiture provisions of this agreement with 24 hours notice.

- 8 -

6.16.7. The KCSO DEU has sole discretion over the manner in which cases will proceed, including the discretion to settle or dismiss a case if deemed appropriate, and whether assets forfeited will be sold or put into service.

6.16.8. Any and all property seized by and forfeited to the KCSO Drug Enforcement or Vice Unit, whether by order of the court, or accepted in settlement in conjunction with this agreement, will be divided in the same manner as indicated above.

6.16.9. The parties agree and acknowledge that the attorney assigned to the KCSO DEU does not have an attorney-client relationship with the City. If such an attorney-client relationship exists, it exists only between the KCSO and the attorney assigned to the KCSO Drug Enforcement Unit.

6.17. Business Plan Development (Strategic Plan): The KCSO will develop a multi-year police services business plan that includes the City in the process. This process would identify KCSO initiatives in advance of the budget year. The goals would be:
- Document the long-term vision for the KCSO (3 to 5 year time frame); departmental mission and core business(s).
- Identify strategic goals for accomplishing the vision; be action oriented with a strong emphasis on achieving practical outcomes.
- Identify how customers will be served consistent with the vision and with limited financial resources.
- Provide objectives, including performance measures, where available, that can be evaluated in the future.

6.18. Computers

6.18.1. The KCSO will provide a laptop and appropriate accessories or a desktop computer to every dedicated and flex sworn FTE purchased by the City.

6.18.2. The KCSO Computer Resources Unit will be responsible for the repair and maintenance of all equipment, software, and accessories that are used in conjunction with the mobile computing program.

6.18.3. Replacement computers will be furnished via the Computer Replacement Fund, approximately every three years. The City will be charged a monthly replacement fee based on the number of computers in the City. This annual cost will appear as a separate line in Exhibit B. If the City bought its own computers, it will receive the unspent balance of the replacement funds should the agreement be terminated.

6.18.4. Annually, the County will estimate the purchase price of replacement hardware, software, accessories and tax. The monthly computer replacement cost will be calculated on a useful life of three years.

6.19. Fire Investigation

6.19.1. For the year 2000, the City may purchase fire investigation services through this agreement. These services will be provided by the King County Department of Development and Environmental Services (DDES) Fire Marshall's Office by separate agreement with the KCSO. The cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "Arson Investigation Costing Model". Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "Arson Investigation Call Out Protocols", unless superseded by new or revised protocols adopted by the Oversight Committee, DDES and affected fire agencies.

6.19.2. During the year 2000, the Oversight Committee will sponsor a series of discussions, to include the KCSO, DDES, the King County Executive, contract cities, Fire Agencies, and other cities receiving DDES Fire Investigation Services. The KCSO, in conjunction with

- 9 -

EXHIBIT A -- PAGE 9

DDES, fire agencies and the cities will be responsible for developing a work plan for Oversight Committee approval. The purpose of this work plan will be to identify options for the long-term provision of fire investigation services to city customers. The work plan may consider the following issues: call-out protocols, costing methods, service delivery and organizational issues. The intent of these parties is that the Oversight Committee will make a recommendation for future service delivery by October 31, 2000.

6.19.3. Day-to-day fire investigation operational issues will be handled at the lowest practical organizational level. This may typically include staff from the city police, fire agencies and DDES.

6.20. Police Investigations Information. The KCSO Major Accident Response and Reconstruction Unit (MARR) and other police investigative services under this agreement shall include providing the City access to all records related to investigations of traffic collisions within the City, upon request, as the records are completed or become available, including but not limited to State Traffic Collision Reports, photographs, diagrams, witness statements and victim(s) statements in the possession of the KCSO. Distribution of toxicology reports and autopsy reports will be controlled by RCW 46.52.065 and 68.50.105. If victims or witnesses identified in any police report or statement have not been interviewed by County personnel, City representatives will coordinate their interviews of these persons with the KCSO prior to contact to avoid prejudice to ongoing criminal investigations, including discussion of scope, timing and value of joint interviews. The KCSO and the City will name representatives to implement this section.

7. Reporting.

7.1. Reporting Districts. Reporting districts coterminous with the City boundaries will be maintained to enable accurate data collection on law enforcement services provided and criminal activity.

7.2. Notification of Criminal Activity. The City Police Chief, if designated, or the precinct commander will notify the City in the event of a significant criminal occurrence within the City.

7.3. Quarterly Reports. The County will report quarterly on criminal activity and on law enforcement services provided by major category of service as listed in Exhibit B.

8. Personnel and Equipment. The County is acting hereunder as an independent contractor so that:

8.1. Control of Personnel. Control of personnel, standards of performance, discipline and all other aspects of performance shall be governed entirely by the County. Allegations of misconduct shall be investigated in accordance with Exhibit D, "Internal Investigations Protocol for Contract Cities" (Exhibit D).

8.2. Status of Employees. All persons rendering service hereunder shall be for all purposes employees of the County, except that the City may hire non-commissioned City employees to perform certain functions in conjunction with County police personnel.

8.3. Liabilities. All liabilities for salaries, wages, any other compensation, injury, or sickness arising from performance of the law enforcement services by the County hereunder shall be that of the County.

8.4. Provision of Personnel. The County shall furnish all personnel and such resources and material deemed by the County as necessary to provide the level of law enforcement service herein described.

8.5. Municipal Violations. KCSO commissioned personnel shall cite violations of municipal ordinances into the City's municipal court.

9. City Responsibilities. In support of the County providing the services described in Exhibit B, the City promises the following.

9.1. Municipal Police Authority. The City promises to confer municipal police authority on such County deputies as might be engaged hereunder in enforcing City ordinances within City boundaries, for the

- 10 -

purposes of carrying out this agreement.

9.2.   Municipal Criminal Code. The City promises to adopt a criminal municipal code that incorporates, at a minimum, any portion of the Washington State criminal code defining a crime or crimes, which falls within the jurisdiction of the district or municipal court. This includes all misdemeanors and gross misdemeanors. Provided, that if the City fails to adopt, chooses not to adopt, or repeals such criminal municipal code, the City shall be responsible for reimbursing the County for all expenses associated with prosecution, adjudication, sentencing, and incarceration in any criminal case involving a crime that could have been included within a City municipal code.

9.3.   Special Supplies. The City promises to supply at its own cost and expense any special supplies, stationary, notices, forms, and the like where such must be issued in the name of the City.

10. Duration. This agreement is effective upon authorization and signature by both parties, except that services and charges shall commence on January 1, 2000. The agreement period shall continue until December 31, 2002, and may be extended until December 31, 2004 by consensus of the Oversight Committee. After the original or extended agreement period has elapsed, the agreement shall renew automatically from year to year unless negotiations for a new contract are initiated by the Oversight Committee, those negotiations are completed and a new contract is adopted, or unless either party initiates the termination process outlined herein.

11. Termination Process. Either party may initiate a process to terminate this agreement as follows:

11.1.   Notice of Termination. The City may choose at some future time to provide law enforcement services other than through the County; similarly, the County may choose at some future time not to provide law enforcement services to the City. Any party wishing to terminate the agreement shall issue a written notice of intent not less than 45 days prior to issuing an 18-month written notice under section 11.2 of this agreement. Upon receipt of the written notice of intent, the City's Chief Executive Officer and the Sheriff shall hold a meeting, the purpose of which will be to understand the notice of intent including background of the reason(s), and a review of alternatives and impacts, among other matters. It is suggested that the Chair of the Oversight Committee be copied on any communication covered in this Section.

11.2.   Written Notice. After the 45-day period has run under Section 11.1 of this agreement, the party desiring to terminate the agreement shall provide at least 18 months written notice to the other party.

11.3.   Transition Plan. Within 120 days of the receipt of such written termination notice, the parties shall commence work on and complete a mutually agreed-upon transition plan providing for an orderly transition of responsibilities from the County to the City. The planning method should proceed along the lines of a project management approach to facilitate the joint planning process by the City and the County. The overarching goal of the transition plan will be to ensure there is not disruption in service to the community as the providers change. This plan would include desired outcomes, project phases (including a preliminary transition plan development) and timelines, and project roles and responsibilities. Each party shall bear its respective costs in developing the transition plan and each will work cooperatively with the other party in the coordination of efforts. The transition plan shall identify and address the continuity of professional and quality police services before, during and through the transition period. The transition plan shall also identify and address any personnel, capital equipment, workload and any other issues related to the transition. Each party shall bear its respective costs in developing the transition plan.

11.4.   Termination and/or Interest Charge. In the event the City fails to make a monthly payment within 60 days of billing, the County may charge an interest rate within two percentage points of the interest rate on the monthly County investment earnings. In addition, in the event the City fails to make a monthly payment within 120 days of billing, the County may terminate this agreement with 90 days written notice.

- 11 -

EXHIBIT A -- PAGE 11

11.4.1. If the City and County are in disagreement over a portion of the bill, the City can withhold the disputed portion of the bill by placing the amount in escrow and following the process outlined in Section 16.3 for resolution of agreement dispute issues.

11.4.2. The County will not charge interest on the disputed portion of the bill nor will it begin the termination process as outlined in section 11.4 so long as the City follows the process outlined in 11.4.1 and pays the non-disputed portion of the bill within 60 days of billing.

12. Indemnification.

12.1. City Held Harmless. The County shall indemnify and hold harmless the City and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the County, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any such suit based upon such a claim, action, loss, or damages is brought against the City, the County shall defend the same at its sole cost and expense; provided that the City reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment in said suit be rendered against the City, and its officers, agents, and employees, or any of them, or jointly against the City and the County and their respective officers, agents, and employees, or any of them, the County shall satisfy the same.

12.2. County Held Harmless. The City shall indemnify and hold harmless the County and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the City, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any suit based upon such a claim, action, loss, or damages is brought against the County, the City shall defend the same at its sole cost and expense; provided that the County reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment be rendered against the County, and its officers, agents, and employees, or any of them, or jointly against the County and the City and their respective officers, agents, and employees, or any of them, the City shall satisfy the same.

12.3. Liability Related to City Ordinances, Policies, Rules and Regulations. In executing this agreement, the County does not assume liability or responsibility for or in any way release the City from any liability or responsibility which arises in whole or in part from the existence or effect of City ordinances, policies, rules or regulations. If any cause, claim, suit, action or administrative proceeding is commenced in which the enforceability and/or validity of any such City ordinance, policy, rule or regulation is at issue, the City shall defend the same at its sole expense and, if judgment is entered or damages are awarded against the City, the County, or both, the City shall satisfy the same, including all chargeable costs and reasonable attorney's fees.

12.4. Waiver Under Washington Industrial Insurance Act. The foregoing indemnity is specifically intended to constitute a waiver of each party's immunity under Washington's Industrial Insurance Act, Chapter 51 RCW, as respects the other party only, and only to the extent necessary to provide the indemnified party with a full and complete indemnity of claims made by the indemnitor's employees. The parties acknowledge that these provisions were specifically negotiated and agreed upon by them.

13. Non-discrimination. The County and the City certify that they are Equal Opportunity Employers. The County has developed and implemented Affirmative Action Programs in accordance with the guidelines in Revised Order 4 of the United States Department of Labor. The City will develop and implement Affirmative Action Programs that meet the applicable federal standards.

14. Audits and Inspections. The records and documents with respect to all matters covered by this agreement shall be subject to inspection, review or audit by the County or City during the term of this agreement and three (3) years after termination.

- 12 -

15. <u>Amendments.</u> This agreement may be amended at any time by mutual written agreement of the City, the King County Sheriff, and the King County Executive, provided that any such amendment must be approved by the Oversight Committee pursuant to section 17.2.4 of this agreement.

16. <u>Agreement Administration.</u>

16.1. <u>Agreement Administrators.</u> The City Chief Executive Officer and the City Police Chief, if designated, or the precinct commander shall serve as agreement administrators to review agreement performance and resolve operational problems. The agreement administrators will meet at least quarterly with either party authorized to call additional meetings with ten days written notice to the other.

16.2. <u>Referral of Unresolved Problems.</u> The City Chief Executive Officer shall refer any police service operational problem, which cannot be resolved, to the King County Sheriff. The Sheriff and City Chief Executive Officer shall meet as necessary to resolve such issues. Unresolved problems shall be referred to the Oversight Committee.

16.3. <u>Agreement Dispute Issues.</u> Agreement dispute issues involving agreement language interpretation, cost, and other non-operational matters shall be referred to the Sheriff, the Chair of the Oversight Committee, the King County Executive's representative to the Oversight Committee, and the affected party or parties to review and resolve. In the event that the dispute involves the city of the Oversight Committee Chair, the Oversight Committee will designate an alternate City Chief Executive Officer to serve as Chair of the Oversight Committee for the purpose of resolving the specific issue. Any unresolved problems shall be referred to the Oversight Committee as a whole.

17. <u>Agreement Oversight.</u>

17.1. <u>Oversight Committee.</u> The City and the County agree to establish an Oversight Committee consisting of the chief executive officers, or their designees, of the cities that contract with the County for law enforcement services, the King County Sheriff, one person designated by the County Executive, and one person designated by the chair of the King County Council's Law, Justice and Human Services Committee, or its successor.

17.2. <u>Scope of Committee.</u> The committee shall meet at least bi-monthly to ensure the parties comply with the provisions of this agreement, including the administration of the agreement and the management and delivery of police services under the agreement.

17.2.1. In addition, the committee shall establish performance measurements, standards, and benchmarks for evaluating the quality of the County's police services. These performance measures shall be developed in cooperation with the Cities that contract for police services. Focus of these measures shall be based on outcome measurements for effectiveness and efficiency as identified by the City Chief Executives and the Sheriff. The County shall work with the City, if desired, to develop a range of options by July 2000, or a later mutually agreed-upon date.

17.2.2. The City's member of the Oversight Committee may make recommendations on any issue affecting agreement costs and conditions, such as the budget for the KCSO, personnel recruitment, training and standards, and collective bargaining issues. These recommendations may reflect approval or disapproval of any County proposal relating to these issues and shall be submitted to the County Executive, County Council, and/or City Council as appropriate. The County shall provide a written report on the outcome of these recommendations.

17.2.3. If an operational problem or agreement dispute is referred to the Oversight Committee pursuant to sections 16.2 or 16.3 of this agreement, the Oversight Committee will meet and attempt to resolve the problem or dispute. If the Oversight Committee is unable to resolve the problem or dispute, this agreement shall be construed in accordance with the laws of the State of Washington.

- 13 -

EXHIBIT A -- PAGE 13

17.2.4. The Oversight Committee is responsible for approving amendments to this agreement, which are first agreed to by the City, the King County Sheriff, and the King County Executive. A majority of a quorum of the Oversight Committee will constitute approval of a proposed amendment.

18. <u>Entire Agreement/Waiver of Default.</u> The parties agree that this agreement is the complete expression of the terms hereto and any oral or written representations or understandings not incorporated herein are excluded. Both parties recognize that time is of the essence in the performance of the provisions of this agreement. Waiver of any default shall not be deemed to be a waiver of any subsequent default. Waiver or breach of any provision of the agreement shall not be deemed to be waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the agreement unless stated to be such through written approval by the County, which shall be attached to the original agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY

King County Executive

City of Burien

Gary Long, Chief Executive Officer

Approved as to Form

Deputy Prosecuting Attorney
for NORM MALENG
King County Prosecuting Attorney

Approved as to Form

Michael Weight, City Attorney

- 14 -

**Amendment to Interlocal Agreement**
**Between King County and the City of Burien**
**Relating to Law Enforcement Services**

WHEREAS King County, a home rule charter county, a political subdivision of the State of Washington, hereinafter referred to as the "County" and the City of Burien, a municipal corporation of the State of Washington, hereinafter referred to as the "City," entered into an Interlocal Agreement in 2000 relating to the provision of law enforcement services; and

WHEREAS, the County and the City desire to amend this Interlocal Agreement to show that computer replacement will take place on a four-year schedule;

NOW THEREFORE, the County and City hereby agree to the following amendments to the 2000 Interlocal Agreement related to Law Enforcement Services:

1. Section 6.18.3 is amended to read: Replacement computers will be furnished via the Computer Replacement Fund, approximately every three four years. The City will be charged a monthly replacement fee based on the number of computers in the City. This annual cost will appear as a separate line in Exhibit B. If the City bought its own computers, it will receive the unspent balance of the replacement funds should the agreement be terminated.

2. Section 6.18.4 is amended to read: Annually, the County will estimate the purchase price of replacement hardware, software, accessories and tax. The monthly computer replacement cost will be calculated on a useful life of three four years.

IN WITNESS WHEREOF, the parties have executed this agreement.

**King County**

King County Executive

$1 2 - 11 - 2003$

Date

*Approved as to Form*

Deputy Prosecuting Attorney

$11/19/03$

Date

**City of Burien**

Gary Long, City Manager

$9 - 17 - 03$

Date

*Approved as to Form*

City Attorney

$9/17/03$

Date

Form Letters2

**Amendment to Interlocal Agreement**

**Between King County and Cities of Burien, Carnation, Covington, Kenmore, Maple Valley, Newcastle, North Bend, Sammamish, SeaTac, Shoreline and Woodinville for Fire Investigation Services Conducted Pursuant to the 2000 Interlocal Agreement relating to Law Enforcement Services**

6.19.1  Fire Investigation

~~For~~ Beginning in the year 2000, the City may purchase fire investigation services through this agreement.  These services will be provided by the King County Department of Development and Environmental Services (DDES) Fire Marshal's Office by separate agreement with the KCSO.  The cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "Arson Investigation Costing Model." Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "Arson Investigation Call Out Protocols," unless superseded by new or revised protocols adopted by the Oversight Committee, DDES and affected fire agencies.

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY

King County Executive

City of _Burien_

3-21-02

Chief Executive Officer

Approved as to Form

Deputy Prosecuting Attorney
for NORM MALENG
King County Prosecuting Attorney

Approved as to Form

City Attorney

EXHIBIT A -- PAGE 16

# EXHIBIT C
# ROLES AND RESPONSIBILITIES OF CONTRACT SERVICE PERSONNEL

## I.    ROLES AND RELATIONSHIPS

### A) COMMISSIONED PERSONNEL

1) Contract service police chiefs, as well as other commissioned personnel, will be responsive to the public safety needs of the contracting entity, as well as its officials, residents, and/or population served.

### B) CONTRACT POLICE CHIEF (CITY POLICE CHIEF FOR CONTRACT CITIES)

1) Command Structure
   (a) Reports directly to Precinct Commander
       (i) If the contract police chief is a KCSO Major, then he or she shall report directly to Division Chief
       (ii) Works at the direction of the City Chief Executive Officer or contract manager/administrator, and in compliance with KCSO policy, procedures, and directives.

2) Title/Insignia
   (a) Police chiefs shall wear one star on each collar point signifying their role as "Police Chief" of a contracting entity . Regardless of KCSO rank, contract chiefs will be addressed as "Chief of Police" in public settings, such as city council meetings, public meetings, and contract service staff meetings.

3) Interaction with Contracting Entity
   (a) The police chief shall interact with contract entity staff and officials in accordance with RCW 35.18.110
   (b) The police chief shall discuss and agree upon protocols for routine, daily interactions with the contract service CEO or manager/administrator as deemed appropriate by the contracting entity.
   (c) The police chief shall function as a department head within the contracting entity's organizational structure, and is expected to conduct himself or herself in a manner that supports and maintains trust in the contracting entity.
   (d) At the direction of the contract service CEO or manager/administrator, and as needed, the police chief shall attend and participate in the contracting entity's staff and council meetings, and official functions, celebrations, and commissions. As requested by the CEO or manager/administrator and as needed, the police chief will also represent the contract service police department at community meetings and functions.
   (e) The Police Chief is the City's Director of Police Services and represents the Chief Executive Officer of the City for all law enforcement matters in the community/City. This may include working with other relevant City departments and or other public agencies (e.g. courts, schools, etc.) on behalf of the City.
   (f) The KCSO views the Contract Cities as customers and will maintain a customer service orientation to managing the contracts. Consistent with this philosophy Police Chiefs are expected to represent the City's point of view, consider City needs in carrying out their duties and advocate on behalf of their City similar to other City departmental directors.

4) Duties
   (a) Supervision Received:
       (i) KCSO command staff maintains authority and responsibility over police chiefs and the precinct.
       (ii) In the event a contracting entity's procedure, policy, goal or operation differs from that of the KCSO, that entity shall negotiate with the KCSO to reach a final determination.
       (iii) The entity's Chief Executive Officer or manager/administrator shall have the general duty and responsibility of providing the assigned police chief with general direction relative to the furnishing of law enforcement services to the contracting entity.
       (iv) The police chief shall maintain communication between command structures to ensure that changes in the KCSO are agreeable to the contracting entity and that changes in the entity

are agreeable to the KCSO.
(b) Duties Include:
   (i)   Operations
   (ii)  The police chief shall direct overall Contract City service police operations, ensuring law enforcement services within the City.
   (iii) The police chief shall analyze operations and develop plans to manage resources and ensure effective and efficient delivery of services.
   (iv)  The police chief shall oversee the implementation of all policies and procedures relating to police services that are established by the contracting entity, and shall provide to the KCSO any written information relative to police services created by the entity. The chief shall notify the KCSO of all procedures that differ from KCSO policies and procedures.
   (v)   The police chief shall utilize analysis of crime data to establish a plan for deploying resources to address identified needs.
   (vi)  The police chief shall coordinate police activities for the contracting entity, including hours of operation and contract-specific protocols and procedures.
   (vii) The police chief shall prepare, in coordination with the King County Sheriff's Office Contract Unit, a budget for the contract police department.
   (viii) The police chief shall coordinate the response of support services used for law enforcement for the contracting entity (e.g., CID, Special Operations).
   (ix)  The police chief shall establish policies and protocols for the response of services that are not purchased by the entity in advance (e.g., optional services).
   (x)   The police chief shall notify the contracting entity's CEO or manager/administrator of any use of support services that were not purchased in advance upon their deployment for enforcing laws for the contracting entity.
   (xi)  The police chief shall notify the contracting entity's CEO or manager/administrator of all major crimes or incidents.

5) Goals, Objectives, and Performance Indicators
   (a) The police chief shall establish goals and objectives for contract police services in conjunction with the City Chief Executive Officer that reflect the specific needs of the contracting entity. The chief shall also identify performance indicators for the entity to measure the established goals and objectives.
   (b) The police chief shall oversee the implementation of all KCSO policies and procedures within the contract services, and maintain a copy of current police procedures on file at the entity's chosen central location for the entity's reference. The chief shall notify the entity's CEO or manager/administrator of any KCSO procedures or changes that either supplement or affect the entity's established goals and objectives for police services.
   (c) The police chief shall review the entity's performance indicators for police services against the stated goals and objectives, and shall report to the CEO or manager/administrator on progress of goal attainment.

6) Personnel Management and Training
   (a) The police chief shall establish standards of performance for officers assigned to the contracting entity.
   (b) The police chief shall identify areas of supplemental training for officers assigned to the entity, and make recommendations to the KCSO for supplemental training. The chief shall also make recommendations to the contracting entity's CEO or manager/administrator for training not provided by KCSO.
   (c) The police chief shall periodically review the performance of officers assigned to the contracting entity and report to entity's CEO or manager/administrator and precinct command staff or Division Chief any recommendations for performance improvement.
   (d) The police chief shall perform selected roll calls of contract-assigned officers.
   (e) The police chief shall coordinate and direct duties of officers assigned to the contracting entity as

specific needs arise, and as requested by entity's CEO or manager/administrator within the context of established policies and procedures. The chief shall report to the precinct any changes in duty of contract-assigned officers.

## C) CONTRACTING ENTITY POLICE MID-MANAGER
  1) Command Structure
      (a) The mid-manager shall report directly to police chief
      (b) The mid-manager shall function as "Acting Police Chief" in the absence of the police chief
  2) Title /Insignia
      (a) The mid-manager shall wears appropriate rank insignia on contract entity uniform consistent with KCSO rank
  3) Interaction With Contracting Entity
      (a) The mid-manager shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
      (b) The mid-manager shall function as a police department mid-manager within contracting entity structure and shall present himself or herself in the community in a manner that supports and maintains trust in the contracting entity.
  4) Duties
      (a) The mid-manager shall directly assist police chief in carrying out duties outlined in I.B(4)

## D) FIRST LEVEL SUPERVISOR/LINE OFFICERS/DETECTIVES/STAFF
  1) Command Structure
      (a) These individuals shall report directly to the police chief, mid-manager,    or    supervisor    as appropriate.
  2) Title/Insignia
      (a) These individuals shall wear rank insignia on uniform consistent with KCSO rank
  3) Interaction With Contracting Entity
      (a) These individuals shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
      (b) These individuals shall present themselves in the community in a manner consistent with being a member of the entity's staff and in a manner that supports and maintains trust in the contracting entity.
  4) Duties
      (a) Will be commensurate with other KCSO assignments

## II. AUTHORITY
  A) The contracting entity police chief shall have authority commensurate with his or her responsibility, which is recognized internally and externally.

  B) Issues that fall within the purview of the police chief of a contracting entity
      1) Prioritization of reactive patrol time
      2) Awards Program
      3) Travel and Expense Guidelines
      4) False Alarm Ordinances/Response
      5) Impound Procedures
      6) Community Policing
      7) Crime Prevention Standards
      8) Additional Training
      9) Supplemental Reports
      10) Incident Notification Policies
      11) Job Description of Supplemental full-time employees (FTE's)
      12) Expenditure of the contracting entity's police budget
      13) Direct access to department support services
      14) Staffing assignments and deployment within confines of dedicated City positions

15) Prioritize meeting attendance (meetings for the contracting entity take priority over county meetings; county meetings will be kept to a minimum and conducted as efficiently as possible)
16) Authorization of support services.
17) Use of volunteers and volunteer programs (except reserve officer).

C) Issues that must have input and approval from the King County Sheriff's Office
   1) Accident Response Criteria
   2) Court Attendance Policies
   3) Call-out Procedures
   4) Uniform/Equipment/Vehicles (including appearance regulations)
   5) Reserve Program
   6) Communications Center Procedures
   7) Traffic Enforcement Policy and Procedures
   8) K-9 Response Policy
   9) Response Priorities
   10) Shift Hours
   11) Specialty Unit Personnel Selection (Street Crimes Units, Crime Prevention, D.A.R.E., etc.)
   12) Prioritization of Precinct Detective Unit Workload

D) Issues that fall within the purview of the KCSO and must be consistent between the King County Sheriff's Office and the contracting entities.
   1) Pursuit Policy
   2) Seized Property
   3) Basic Skills Training
      (a) Emergency Vehicle Operations; Firearms (Include Reviews)
   4) Use of Force
   5) Off-Duty Work
   6) Field Training Officer Program
   7) Personnel Evaluation System/Annual Performance Evaluation
   8) Internal Investigations Unit Policies & Procedures
   9) Reporting Forms
   10) Hostage Negotiations and Tactical Team Deployment
   11) Alternative Work Schedules
   12) Standards of Conduct
   13) Arrest Warrant Policies
   14) Labor Contracts (4)
   15) Supervisory Standards

E) Issues governed exclusively by KCSO policies & procedures:
   1) DV Response
   2) Search & Rescue
   3) Civil Process
   4) Landlord - Tenant Policies
   5) Abandoned/Unclaimed Property
   6) Training
   7) Basic Law Enforcement Training Academy
   8) BAC - State
   9) First Aid - L&I
   10) CPR - L&I
   11) Computer Info Access Training
   12) Airborne/Bloodborne Pathogens
   13) OSHA/WSHA/EPA Requirements
   14) King County Code of Ethics
   15) Public Disclosure and Records

16) Gun Permits and Concealed Pistol Licenses
17) Federal Labor Standards Act
18) Family Leave and Benefits Policies
19) Americans with Disabilities Act
20) Civil Service Rules
21) King County Career Service Rules
22) EEOC Guidelines/Requirements
23) Discipline

## III. INCENTIVES/REWARDS

A) Contracting entities may award incentives or other recognition within existing guidelines, ethics guidelines, department rules and contract language, interlocal agreements and the award systems of the entity, KCSO and county.

## IV. COMMITMENTS, TRANSFERS, and PROMOTIONS

A) KCSO staff requesting assignment to a contracting entity will make a two-year commitment to work as a member of the entity's police force, except in cases of promotion or other special circumstances. Such special circumstances require the concurrence of the entity's CEO or manager/administrator and applicable KCSO Division Chief.

B) The transfer of personnel affecting the entity's police force will be coordinated by the KCSO, in consultation with the entity's Police Chief, to minimize the impact of potential vacancies. The number of the entity's vacant positions will be managed with a goal of achieving proportionality with the total number of vacant positions in the KCSO.

C) Contracting entities may not make de facto promotions by their selection of personnel except in instances in which a pool of candidates is made available for selection by the KCSO.

## V. STATISTICAL REPORTS

A) Whenever possible, reports shall be generated by the Research, Planning, and Information Services Unit.

B) All reports will be routed through RP&IS Unit.

C) A courtesy copy of all unique reports that are generated by contract police departments will be sent to RP&IS Unit.

D) Reports will include footnotes identifying the source of the information.

E) Service enhancement proposals will be routed through RP&IS Unit.

## VI. SHARED SUPERVISION PROTOCOL

A) The City's Police Chief is responsible for police services within the City. If desired by the City, the City Police Chief, Precinct Commander and appropriate staff shall develop an agreement that addresses in-City Precinct directed field services.

B) Dedicated City officers will be assigned to respond to calls within the City in line with City protocols, and consistent with section II of this document.

# EXHIBIT D:
# INTERNAL INVESTIGATIONS UNIT PROTOCOLS

I. POLICY STATEMENT

   A) It is the desire of the Internal Investigations Unit (IIU) to be responsive to the needs of the Contract Cities, be sensitive to the rights of the individuals involved, and to comply with statutes, case law, and collective bargaining agreements that govern internal investigations.

II. COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN THE CONTRACT CITY

   A) Current KCSO policy requires that members refer the complainant to IIU or notify a supervisor. Supervisors who become aware of a complaint shall conduct a preliminary investigation and forward the results to their commander. IIU will ensure that the City Police Chief is made aware of complaints of significant misconduct in their City at the earliest practical time. The City Police Chief will ensure that the Chief Executive Officer is informed of all complaints of significant misconduct at the earliest practical time.

   B) City staff and councilmembers may receive complaints of Department personnel misconduct. These complaints should be referred to the Chief Executive Officer or designee who in turn will pass on to Precinct Commander/City Police Chief, an on duty supervisor, or IIU depending on the time of day, the availability of a supervisor, or the seriousness of the complaint.

III. COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN IIU

   A) Complaints received in the Internal Investigations Unit concerning personnel assigned to a contract city or incidents that occur within the City, will be investigated according to current policy. The IIU Commander, or designee, shall notify the affected Precinct Commander/City Policy Chief of the complaint as soon as practical.

   B) The criteria for case assignment to the precinct/city for investigation shall be consistent with current KCSO Policy. General Order 10.40.135, identifies the following types of investigations that will remain with IIU for follow-up:

      1) When sustained, could result in termination or demotion
      2) Where criminal conduct is involved
      3) When there are controversial or newsworthy circumstances
      4) Any complaint the Commander deems appropriate to be investigated by IIU
      5) Any complaint the Sheriff directs IIU to investigate

   C) The Internal Investigations Unit reviews all "Use of Force Reports", and investigates complaints of excessive force.

IV. INVESTIGATION OF PERSONNEL MISCONDUCT

   A) Investigations of alleged personnel misconduct shall be conducted in accordance with General Orders Manual, Section 10, Personnel Complaint Manual and General Orders Manual 3.01.000, Investigation of Personnel Misconduct.

   B) Completed investigations conducted at the Precinct or City level shall be reviewed by the Precinct Commander/City Police Chief and forwarded to IIU through the Chain of Command.

V. INFORMATION PROVIDED TO THE CHIEF EXECUTIVE OFFICER

   A) Chief Executive Officers shall be notified of complaints of misconduct involving KCSO personnel assigned to the City or of incidents that occur within the City. This notification may come from either the Precinct Commander or the City Police Chief.

   B) Results of the investigation will be shared with the Chief Executive Officer, as soon as practical, but the investigative file may not be copied in accordance with case law. Specific discipline for sustained

complaints emanating from the member's assignment to the City will be disclosed to the Chief Executive Officer.

C) Written correspondence to the complainant will originate from the KCSO. City letterhead with the signature block, "Commander, Internal Investigations Unit" may be used rather than the KCSO letterhead. The City letterhead option is available for the City, but not required.

VI.    GRIEVANCE PROCEDURES

A) KCSO members may file a grievance concerning the findings or discipline as the result of a complaint investigation according to the current collective bargaining agreement.

B) Local, State, and Federal statues; case law; and the member's collective bargaining agreement govern the grievance procedure.

# EXHIBIT F
# GLOSSARY OF TERMS

**Absence**
The state of being absent from one's assigned duties for a period of time though funds, in most cases, continue to be expended.

**Absent without leave**
Absent without authorization.

**Administrative Sergeant**
Reports directly to the City's Commanding Officer (Captain or Major) and assists in carrying out the commander's duties; functions as "Acting Police Chief" in the absence of the City Police Chief; wears appropriate rank insignia on city uniform consistent with KCSO rank; interacts with the city staff and city council members in accordance with RCW 35.18.110; and; is expected to present her/himself in the community in a manner that supports and maintains trust in the contract city government and staff.

**Alternative shift schedules**
Subject to negotiation, this includes flex time (an employee's shift starting time may vary up to 4 hours from normal).

**Audit**
A formal examination of the KCSO's accounts or financial situation; a methodical examination and review.

**Backfill**
Staffing a patrol district with some one other than the normally scheduled deputy due to a planned or unplanned absence.

**Benefits**
Medical, dental, unemployment, A & D and life insurance, retirement plans; and vacation, sick and holiday pays.

**Bereavement Leave**
Up to 3 days leave with pay that can be used when a member of one's immediate family passes away.

**BLET/BLEA**
Basic Law Enforcement Training/Academy (720 hours).

**Captain**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Major.

**Car Per Officer (CPO)**
Take home vehicles assigned to department members.

**Career Service Employee**
An employee who is appointed to a career service position as a result of a competitive examination process.

**Chief**
See "Contract City Police Chief" below.

**Chief (Division)**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Sheriff.

**City Department Model**
Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. For precinct level services, operates as a stand alone model.

**City Police Precinct**
To qualify as a City Police Precinct, the following minimum standards must be met:
- meet or exceed all applicable city, state and federal codes and requirements.
- provide sufficient secure office space to accommodate all personnel permanently assigned to the precinct.
- provide appropriate locker and shower/restroom facilities for all male and female assigned staff.
- provide adequate secure, fenced parking for police vehicles.
- provide at least two separate holding cells that meet all county, state and federal codes for temporarily segregating and detaining male/female and juvenile/adult prisoners.
- provide a private, secure entrance through which prisoners can be moved in and out of the holding cell area.
- provide two interview rooms and a meeting/roll-call room.
- provide a permanent evidence storage room and additional safe, secure storage for small arms ammunition, explosives, flammable materials and other hazardous substances.
- provide a secure area in which to air dry wet evidence prior to packaging.
- provide a connection to the county WAN and other applicable telecommunications systems infrastructure that meets or exceeds county standards.
- provide concealed pistol permit and other administrative services to the public at the city police precinct or other city facility.

**Civil Service Employee**
An employee who is appointed to a (government) civil *service* position as a result of a competitive examination process.

**Clothing Allowance**
Deputies not required to wear a uniform for at least one full month receive additional pay while so assigned.

**Commissioned**
Sworn officers/deputies.

**Communications Center**
Provides emergency telecommunications services between citizens and appropriate public safety agencies on a 24 hour a day basis including a Computer Assisted Dispatch (CAD) system that allows operators to dispatch sworn officers and non-sworn community service officers (CSO's) to calls for police services and take some types of incident reports via the telephone.

**Community Service Officer (CSO)**
Non-sworn, uniformed staff who do not have arrest authority.

**Compensatory time**
Time off that is granted with pay in lieu of pay to FLSA-overtime eligible employees for work performed either on an authorized overtime basis or on a holiday that is normally scheduled as a day off.

**Contract City Police Chief**
Reports directly to Precinct Commander (if Major, directly to Division Chief); works at the direction of city manager/administrator and in compliance with KCSO Policy, Procedures & Directives; Interacts with city staff and council members in accordance with RCW 35.18.110; Functions as a department head within the contract city structure. KCSO ranks that qualify for the chief's position are determined by city population: Sergeant – less

than 20,000: Captain – greater than 20,000: cities choosing the full city model department may select a Major as chief.

**Court overtime**
Deputies are compensated for court appearances, pre-trial hearings or conferences at the county overtime rate stated in the Collective Bargaining Agreement, Article 8, Section 3.

**Dedicated staff**
Personnel regularly assigned to a contract city.

**Deputy (Officer)**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Sergeant.

**Disability**
A person is considered to have a "disability" if s/he has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

**Discretionary training**
Training not mandated by federal, state or county regulations.

**Dispatched calls for service (DCFS)**
Police details that are initiated through the communications center.

**Educational incentive pay**
Additional pay commensurate with an employee's education.

**Fair Labor Standards Act (FLSA)**
A law governing compensation for hours worked/overtime.

**Family Leave**
Paid absence to care for a child, spouse or parent with a serious health condition (employees may receive up to 6 days paid leave per year to be used in lieu of sick leave for family care purposes).

**Family Medical Leave Act (FMLA)**

**Federal Emergency Management Agency (FEMA)**

**Field Training Officer (FTO)**
An experienced deputy with special training used to train and evaluate recruit officers.

**Field Training Program**
An organized training program and standardized evaluation process for recruit officers to ensure that each candidate has an equal opportunity to succeed.

**Field Training Sergeant**
Assists in the FTO selection process, monitors recruit and FTO performance; initiates, schedules, monitors and documents any special recruit training assignments; completes weekly evaluation reports of reach Phase II recruit, schedules and chairs Alternate Week Evaluation meetings.

**Flexible Services Model**
Under the flexible services model, base level law enforcement services will be provided to the city in proportion to the City's share of workload.

**Hazardous duty pay**
Additional pay given to a deputy while serving in one of the following assignments: helicopter, bomb disposal, motorcycle, scuba diver,K-9, TAC-30, patrol, clandestine drug lab team.

**Lateral Academy**
Recruit training for lateral entry officers.

**Lateral entry deputy/officer**
A deputy hired with prior law enforcement experience.

**Leaves of absence**
Governed by R.C.W. 41.14.160 and King County Ordinance 3.12.250.
1.  Precinct or Section Commanders may grant up to twenty-four (24) hours of leave without pay for their Department members under their command.

2.  Leaves without pay over twenty-four (24) hours may only be granted by the Sheriff.
    A)  Leaves without pay for periods of more than one (1) month shall also be approved in writing and in advance by the Director of the Office of Human Resource Management.

3.  Department members shall obtain the appropriate memorandum form from the Personnel Unit, and complete either:
    A)  Medical leave of absence (other than maternity); or
    B)  Medical leave of absence (maternity).

**Leave with pay**
Authorized time off with pay - examples include vacation, compensatory time, and parental leave.

**Leave without pay**
Any absence of an employee from duty without compensation.

**LEOFF 1**
Law Enforcement and Fire Fighters Retirement System (Prior to October 1, 1977).

**LEOFF 2**
Law Enforcement and Fire Fighters Retirement System (Since October 1, 1977).

**Limited commission (also called a special commission)**
Grants a deputy specific duties within a specified area.

**Longevity pay**
Additional pay given for length of service.

**Major**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Division Chief.

**Managing Patrol Performance (MPP)**
A computer based patrol staffing model.

**Mandatory training**
Training that is mandated by state or federal regulations (i.e., Firearms, EVOC, Hazmat, First Aid and CPR).

**Master Police Officer (MPO)**

A non-civil service position appointed by a Selection Committee BI-annually from an eligibility list meeting the criteria in KCSO General Orders Manual Section 1.06.000 and subordinate to the rank of Sergeant.

**Media Relations Officer (MRO)**
Deputy chosen to be responsible for organizing all media interactions.

**Military leave**
Leave of absence with pay for active military duty.

**Non-chargeable services**
Services generally deployed county-wide and not charged under the contract for legislative or policy reasons.

**Non-commissioned**
Non-sworn personnel.

**Officer**
See Deputy

**Parental leave**
Leave of absence to care for a newborn child, a newly adopted child or a newly placed foster child.

**Permanent (Regular) assignment**
Normal duty station.

**PERS 1**
Public Employees Retirement System (Prior to October 1, 1977).

**PERS 2**
Public Employees Retirement System (Since October 1,1977).

**Phase I Recruit**
A deputy who is attending the Basic Law Enforcement Academy or one of the Pre or Post BLEA courses.

**Phase II Recruit**
A deputy who, after successful completion of the Basic Academy, is assigned to a precinct for field training for three months with a series of three Field Training Officers (FTO's).

**Phase III Recruit**
A deputy who successfully completes Phase II will be assigned to a district as a one-person unit/car under the supervision of a MPO (recruits will have special training assignments and receive monthly observation reports).

**Phase IV Recruit**
A deputy who, after 12 months of employment, is working safely, skillfully and effectively as a "competent police officer" (the deputy is assigned a MPO mentor through the end of his/her probationary time, but no longer has monthly observation reports).

**Post BLET/BLEA**
Post Basic Law Enforcement Training/Academy.

**Pre BLET/BLEA**
Pre Basic Law Enforcement Training/Academy.

**Premium pay**
Aditional pay for specialty assignment.

**Promotion**
The movement of an employee to a higher rank.

**Quartermaster**
A sergeant who provides uniforms and equipment for department personnel.

**Retirement**
Completing employment/service as administered and in accordance with the provisions of RCW Chapter 41.40.

**School Resource Officer (SRO)**
A deputy who provides a school-based community policing presence at primary and secondary schools.

**Shared Supervision Model**
Under the shared supervision model, the level, degree and type of precinct/city direct services (such as reactive patrol, precinct detectives and city administrative sergeants, for example) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee (Precinct command and supervision shall be shared by the County and the City). Patrol and other precinct staff may be dedicated to the City, but line supervision and other staff are shared with the rest of the precinct.

**Sheriff**
Elected Chief Executive of the King County Sheriff's Office.

**Sick leave**
Paid leave of absence from work due to employee or family member's illness.

**Transfer**
Movement of an employee from one position to another position that has the same or comparable job classification and salary.

**Temporary assignment/position**
An assignment/position that is not a regular assignment/position and includes probationary period or provisional appointment.

**Termination**
Separation of employment as a result of discharge, resignation, retirement, reduction in force, or death.

**Vacancy**
A position which is empty, unfilled, or unoccupied such that no funds are being expended.

**Washington State Criminal Justice Training Center (WSCJTC)**
Commonly referred to as the "Academy", the WSCJTC is located in the City of Burien, and serves as the primary training site for western Washington police recruits.

# EXHIBIT G
## ARSON INVESTIGATION COSTING MODEL

### ARSON SERVICE TO CITIES
### SUMMARY OF ESTIMATED COSTS FOR AVERAGE
### OF 3 CALCULATION METHODS
#### Updated for Cities participating as of 03/03/00

| Jurisdiction | Percent Based on Hours Share | Percent Based on Value Share | Percent Based on Incident Share | $ Share Average of Three Methods | Percent Average of Three Methods |
|---|---|---|---|---|---|
| Black Diamond | 1.3% | 1.4% | 0.9% | $1,469 | 1.2% |
| Burien | 20.4% | 15.4% | 18.0% | $22,007 | 17.9% |
| Carnation | 0.2% | 0.2% | 0.4% | $349 | 0.3% |
| Covington | 9.5% | 4.3% | 9.9% | $9,703 | 7.9% |
| Des Moines | 3.2% | 4.1% | 1.6% | $3,666 | 3.0% |
| Duvall | 0.1% | 1.2% | 0.9% | $896 | 0.7% |
| Enumclaw | 1.0% | 7.4% | 1.8% | $4,208 | 3.4% |
| Kenmore | 7.5% | 8.9% | 12.4% | $11,783 | 9.6% |
| Maple Valley | 3.7% | 6.4% | 6.1% | $6,625 | 5.4% |
| North Bend | 1.9% | 2.9% | 2.2% | $2,849 | 2.3% |
| Pacific | 1.5% | 4.1% | 1.9% | $3,045 | 2.5% |
| Seatac | 15.3% | 19.0% | 15.5% | $20,360 | 16.6% |
| Sammamish | 5.1% | 0.0% | 4.9% | $4,095 | 3.3% |
| Shoreline | 25.7% | 21.4% | 18.5% | $26,888 | 21.9% |
| Woodinville | 3.7% | 3.4% | 5.1% | $4,985 | 4.1% |
| Total | 100.0% | 100.0% | 100.0% | $122,929 | 100.0% |

# EXHIBIT H
# ARSON INVESTIGATION
# CALL OUT PROTOCOLS

Fire Investigation Unit - Call Out Protocols – Contract Cites          FINV-0012b

| Department/Issuing Agency | Effective Date |
|---|---|
| Building Services Division | Apr 1, 2000 |

| Approved by | Type of Action  Page Number |
|---|---|
| | Revision Page 1 of 3 |

1.0  **SUBJECT TITLE:**  Fire Investigation Unit - Call Out Protocols for contract cities

2.0  **PURPOSE:**

2.1     To outline the policies of the King County Fire Marshal's Office regarding the investigation of fires in cities having a contractual agreement for fire investigation with King County and to establish recommended procedures to be followed by the responsible fire suppression agency in determining when a King County fire investigator should be requested.

3.0  **ORGANIZATIONS AFFECTED:**

3.1     Department of Development and Environmental Services
3.2     King County Fire Marshal's Office
3.3     Fire Departments/Districts providing fire suppression to a city that has contracted with the King County Fire Marshal's Office for fire investigation services.
3.4     King County Sheriff's Office
3.5   Cities having contracts with King County for fire investigation services

4.0  **REFERENCES:**

4.1     Uniform Fire Code
4.2     R.C.W. Chapter Title 9 and 9A
4.3     R.C.W. 19.27.110
4.4     R.C.W. 52.12.031 (7)
4.5     R.C.W. 48.48.060
4.6     King County Administrative Policies and Procedures
4.7     King County Fire Marshal Operating instructions Manual
4.8     King County Fire Marshal Policy & Procedure Manual

Number: FINV-0012b

**Page 2 of 3**

5.0 **PROCEDURE:**

    5.1    The Fire Investigation Unit should be notified and respond to fires as follows:

        a.  Fires where one or more deaths have occurred.

    b.  Fires where one or more serious injuries have occurred, and those injuries have required or are expected to require hospitalization of the injured party(s).

        c.      Fires that are suspected to be, or are known to be intentionally set and are not investigated by Fire Department personnel under one of the excepted categories in 6.2.

        d.      Fires where the fire suppression agency has not determined a cause, except where the loss is minimal and there is no measurable value in determining the cause.

        e.      <u>All</u> fires where there is evidence that an explosive device was used to initiate the fire or resulted in the fire occurring.

**Note: This provision is not intended to include containers normally found at the fire scene that exploded as a result of the fire, such as propane bottles, compressed air bottles or aerosol containers.**

    5.2    The King County Fire Marshal's Office will maintain an investigative program designed to collect, store and disseminate information relating to the prevention of fires, accidental or arson caused, to reduce loss of life, fire related injuries, incident frequency and monetary loss.

    5.3    Every effort will be made to determine the cause of every investigated fire.

    5.4    Where the cause has been determined to be arson, the Fire Investigation Unit of the King County Fire Marshal's Office shall perform the follow-up investigation and preparation of criminal charges where appropriate.

    5.5    In incidents involving death or serious injury where hospitalization was or is expected to be required, all reports, evidence, and photographs will be properly secured by the fire investigation unit until the case has been resolved

    5.6    The King County Fire Investigation Unit will compile and submit monthly UCR (Uniform Crime Reporting) data for the Federal Bureau of Investigation to the King County Sheriff's Office, for cities who contract with the King County Sheriff's Office for police services and to the City Police department for all cities that maintain their own Police Department if requested.

6.0 **RESPONSIBILITIES:**

    6.1    The King County Fire Investigation Unit is responsible for the investigation of all fires that have been investigated by the Fire Investigation Unit as outlined in section 5.1 of this document.

Number: FINV-0012b

**Page 3 of 3**

6.2    Qualified Fire Department personnel in the responsible fire suppression agency may conduct fire investigations in the following categories:

a.    Intentionally set fires in Dumpsters and other refuse/garbage containers.

b.    Intentionally set fires in Newspaper collection containers

c.    Intentionally set fires in Newspaper distribution structures (Times, P.I., etc.).

d.    Intentionally set fires in Containers used for collection of clothing, etc.

e.    Intentionally set fires in abandoned vehicles with a value less than $250.

f.    And other such fires as the responsible fire department is qualified to investigate.

6.3    For investigations conducted by Fire Department personnel for the investigations noted in section 6.2 above the following recommended procedures may be followed:

a.    Notification of the King County Fire Investigation Unit the following business day of all fire investigations conducted by the Fire Department in accordance with Section 6.2 for all fires that were determined to be intentionally set.

b.    Examination of the fire scene to determine area, point of origin and cause

c.    Identification, protection, preservation and collection of all physical evidence for all fires that were determined to be intentionally set. Fire department personnel will assist the responsible police department patrol unit in packaging of evidence, which will then be transported by the patrol unit for storage.

d.    Preparation of a comprehensive fire investigation report using the King County Fire Investigation Unit format and, where necessary, a fire scene sketch for all fires that were determined to be intentionally set.

e.    Photographing of the fire scene should be accomplished in three (3) steps, 1) prior to disturbing any debris or other items at or near the point of origin, 2) once again during the examination and 3) at the conclusion of the examinations. Any items considered to be evidence should be shown in photographs at the time and place they were discovered and identified.

f.    Notification of the responsible police department via the police communications center where arson is suspected or confirmed.

g.    Forwarding of the fire report along with all available information obtained during the investigation and transfer of the physical evidence, where appropriate, to the Fire Investigation Unit for all fires that were determined to be intentionally set.

h.    Forwarding a copy of the photographs (or other acceptable photographic medium) and the negatives of the incident to the Fire Investigation Unit for all fires that were determined to be intentionally set.

Note:   The proper documentation of fire incidents, accidental or arson, is critical. The scene examination must provide factual information describing what, where, why, and how this fire occurred. Photographs, properly taken, will provide a picture record of the conditions on arrival, during examination, and at the conclusion. The combination will be the basis for re-construction of the fire scene, determination of important time factors and sequence of events prior to and at the time of the fire, including the fire tactics used in extinguishing the fire, an important consideration.

Burien Contract # **0975**

# City of Burien, Washington
## Contract Routing Sheet

Name of Contracting Party: <u>King County Sheriff's Office</u>

Project Name/Description: <u>Amendment relating to Fire Investigation Services being moved from</u>
<u>DDES to Sheriff's Office</u>

Contract Amount: $ <u>N/A</u>
(Include Contractor's Proposal Amount and Sales Tax)

Type of Contract:

| ☐ Architectural/Engineering | ☐ Construction | ☐ Human Services/Arts |
|---|---|---|
| ☐ From Engineering Roster | ☐ Informal Bidding Process Done-3 bids (less than $20,000/$35,000) | &Culture/City Match |
| ☐ Advertised Bidding Done | ☐ From Small Works Roster ($20,000/35,000 to $100,000) | ☐ Other: _____ |
| ☐ Professional Services (Non-Engineering) | ☐ Competitive/Advertised Bidding Done (Over $100,000) | ☐ Contract Amendment to Contract No.0975 |
| ☐ 3 Bids received | ☐ Other: _____ | |
| ☐ Direct Negotiation | | |

*(Please attach a list of all bids received)*

Is this contract authorized in the current year's budget? ☐ Yes  ☐ No

If budgeted, list Fund/Dept.: <u>General Fund – Police Services</u>

Page # in Budget: _____     Budget line item amount: $_____

If not budgeted, Fund/Dept where should be budgeted? _____

Is a budget amendment needed? ☐ Yes  ☐ No   Amount? $_____

Date of Council Approval: <u>November 3, 2008</u>
*(Please attach a copy of the agenda bill and backup.)*

**REVIEWED BY:**
Contract Manager: _Tabatha_ _____ Date: _____

Department Director: _____ Date: _____

Management Analyst: _Lori Fleming_ _____ Date: _____

| **Routing Instructions:** | **Contract File Checklist:** |
|---|---|
| ☐ Send original to Contractor for their signature and then provide a copy of the fully signed contract to _____ | ☐ Purchase Order #_____ |
| ☐ Contract is already signed by Contractor, please provide a copy of the fully signed contract to: _____ | ☐ Tax ID Form |
| | ☐ Current Business License |
| ☐ Other (Please describe) _____ | ☐ Insurance Certificate |
| | ☒ Contract Fully Signed |

Document0



**KING COUNTY**

KING COUNTY SHERIFF'S OFFICE
516 Third Avenue, W-116
Seattle, WA 98104-2312
Tel: 206-296-4155 • Fax: 206-296-0168

Susan L. Rahr
*Sheriff*

May 8, 2009

Ms. Lori Fleming
Management Analyst
15811 Ambaum Blvd SW, Suite C
Burien, Wa. 98166

RE:     Fire Investigations Amendment to 2000 Interlocal Agreement

Dear Ms. Fleming:

Enclosed please find one signed original version of the most recent amendment to our Interlocal Agreement for law enforcement services. This amendment makes the changes we agreed to regarding the Fire Investigations Unit's move from the Department of Development and Environmental Services (DDES) to the Sheriff's Office in 2008.

We value our continuing partnership with you and your city. If we can be of any assistance, or if you have questions regarding this amendment, please don't hesitate to call me at (206) 205-0470.

Thank you,

Robin Rask
King County Sheriff's Office, Contracting Unit

cc:     Chief Greg Dymerski, KCSO Criminal Investigations Division
        Captain Debbie Huntsinger, KCSO Major Investigations Section
        KCSO Budgeting & Accounting
        KCSO Contracts File

Enclosure

# ORIGINAL

### Amendment to Interlocal Agreement
### Between King County and Cities of Beaux Arts, Burien, Covington, Kenmore, Maple Valley, Newcastle, North Bend, Sammamish, SeaTac, Shoreline, Skykomish, and Woodinville
### for Law Enforcement and Fire Investigation Services

WHEREAS, the parties entered into an Interlocal Agreement for law enforcement services in 2000;

AND WHEREAS, in 2002 section 6.19.1 relating to fire investigation services was amended;

NOW THEREFORE:

**1) Section 6.19 is amended as follows:**

6.19     Fire Investigation

6.19.1   ~~Beginning in the year 2000, t~~The City may purchase fire investigation services through this agreement.  These services will be provided by the King County <u>Sheriff's Office (KCSO)</u> ~~Department of Development and Environmental Services (DDES) Fire Marshal's Office by separate agreement with the KCSO~~ <u>and are optional to the city</u>.  <u>If the city purchases fire investigation services from the County,</u> ~~T~~the cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "~~Arson~~ <u>Fire</u> Investigation Costing Model."  Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "~~Arson~~ <u>Fire</u> Investigation Call Out Protocols," unless superseded by new or revised protocols adopted by the Oversight Committee, ~~(DDES)~~ <u>KCSO,</u> and affected fire agencies.

6.19.2   ~~During the year 2000, the Oversight Committee will sponsor a series of discussions, to include the KCSO, DDES, the King County Executive, contract cities, Fire Agencies, and other cities receiving DDES Fire Investigation Services. The KCSO, in conjunction with DDES, fire agencies and the cities will be responsible for developing a work plan for Oversight Committee approval. The purpose of this work plan will be to identify options for the long-term provision of fire investigation services to city customers. The work plan may consider the following issues: call-out protocols, costing methods, service delivery and organizational issues. The intent of these parties is that the Oversight Committee will make a recommendation for future service delivery by October 31, 2000.~~

ORIGINAL

6.19.3   Day-to-day fire investigation operational issues will be handled at the lowest practical
organizational level. This may typically include staff from the city police, fire agencies and
~~DDES~~ King County Sheriff's Office.

**2) Exhibit G is amended as follows:**

EXHIBIT G: ~~ARSON~~ FIRE INVESTIGATION COSTING MODEL

Pursuant to section 6.19 of the Interlocal Agreement Relating to Law Enforcement Services,
the King County Sheriff's Office (KCSO) ~~Department of Development and Environmental~~
~~Services (DDES)~~ will provide optional fire investigation services to cities contracting with the
King County Sheriff's Office ~~KCSO~~ for police services. The extent to which contract cities use
these fire investigation services is not likely to be uniform. This exhibit sets forth the model by
which costs of providing such service is to be allocated among the contracting cities.

A city will be charged in accordance with its percentage of historic usage of the service. The
total cost to the County is reflected in Exhibit B, as updated by the County from year to year. A
percentage of that total cost is assigned to each city based on its historic usage. The
percentages of historic usage by cities are updated for each successive contract year. A three-
year average is used with the most recent year being added and the oldest year being deleted.
A summary table setting forth the current updated percentage assigned to each city is
included in Exhibit B.

To determine the cost for each city, the total County cost identified in Exhibit B shall be
multiplied by the city's average percentage of use indicated on the most current summary
table (Exhibit B). Each city must pay the amount specified whether the service is used during
the contract year or not. If a city does not use the services during the contract year, that city's
percentage assignment for fire investigation services will drop due to the three-year averaging
approach described above. There is no refund for low usage or non-usage.

In the event that cities collectively utilize more or less ~~hours~~ than the previously established
"share" of the Fire Investigations Unit assigned to contract cities, and the total ~~program cost~~

city charge no longer meets ~~accordingly exceeds~~ the total cost to the County ~~set forth in Exhibit B,~~ the County shall adjust the "share" in the following year's Exhibit B per Section 4 (Compensation) of the ILA. Any "share" adjustment shall require the approval of a majority of Oversight Committee members. ~~those cities exceeding their assigned percentage shall be responsible for the additional cost.   Additional costs shall be billed to cities at the DDES' hourly overtime rate set forth in Exhibit B.~~

**3) Exhibit H is amended as follows:**

EXHIBIT H: ~~ARSON~~ FIRE INVESTIGATION CALL OUT PROTOCOLS

1.0     SUBJECT TITLE: King County Sheriff's Office Fire Investigation Unit - Call Out Protocols for contract cities

2.0     PURPOSE:

2.1 To outline the policies of the King County ~~Fire Marshal's~~ Sheriff's Office regarding the investigation of fires in cities having a contractual agreement for fire investigation with King County and to establish recommended procedures to be followed by the responsible fire suppression agency in determining when a King County fire investigator should be requested.

3.0     ORGANIZATIONS AFFECTED:

~~3.1        Department of Development and Environmental Services~~

3.~~2~~1     King County ~~Fire Marshal's~~ Sheriff's Office

3.~~3~~2     Fire Departments/Districts providing fire suppression to a city that has contracted with the King County ~~Fire Marshal's~~ for fire investigation services.

~~3.4        King County Sheriff's Office~~

3.~~5~~3     Cities having contracts with King County for fire investigation services

4.0     REFERENCES:

4.1     ~~Uniform~~ International Fire Code

4.2     R.C.W. Chapter Title 9 and 9A

4.3     R.C.W. 19.27.110

4.4     R.C.W. 52.12.031 (7)

4.5     R.C.W. 48.48.06~~0~~50

4.6     King County Administrative Policies and Procedures

4.7     King County Fire Marshal Operating Instructions Manual

4.8     King County Fire ~~Marshal~~Investigation Unit Policy & Procedure Manual

5.0     PROCEDURE:

5.1     The Fire Investigation Unit should be notified and respond to fires as follows:

a.      Fires where one or more deaths have occurred.

b.      Fires where one or more serious injuries have occurred, and those injuries have required or are expected to require hospitalization of the injured party(s).

c.      Fires that are suspected to be, or are known to be intentionally set and are not investigated by Fire Department personnel under one of the excepted categories in 6.2.

d.      Fires where the fire suppression agency has not determined a cause, except where the loss is minimal and there is no measurable value in determining the cause.

e.      All fires where there is evidence that an explosive device was used to initiate the fire or resulted in the fire occurring.

Note:   This provision is not intended to include containers normally found at the fire scene that exploded as a result of the fire, such as propane bottles, compressed air bottles or aerosol containers.

5.2     The King County ~~Fire Marshal's~~ Sheriff's Office will maintain an investigative program designed to collect, store and disseminate information relating to the prevention of

fires, accidental or arson caused, to reduce loss of life, fire related injuries, incident frequency and monetary loss.

5.3     Every effort will be made to determine the cause of every investigated fire.

5.4     Where the cause has been determined to be arson, the Fire Investigation Unit of the King County ~~Fire Marshal's~~ Sheriff's Office shall perform the follow-up investigation and preparation of criminal charges where appropriate.

5.5     In incidents involving death or serious injury where hospitalization was or is expected to be required, all reports, evidence, and photographs will be properly secured by the fire investigation unit until the case has been resolved

5.6     The King County Fire Investigation Unit will compile and submit monthly UCR (Uniform Crime Reporting) data for the Federal Bureau of Investigation to the King County Sheriff's Office, for cities who contract with the King County Sheriff's Office for police services and to the City Police department for all cities that maintain their own Police Department if requested.

5.7     Fire investigators will submit a scene report within 48 hours of an incident to the police chief and fire chief.

6.0     RESPONSIBILITIES:

6.1     The King County Fire Investigation Unit is responsible for the investigation of all fires that have been investigated by the Fire Investigation Unit as outlined in section 5.1 of this document.

6.2     Qualified Fire Department personnel in the responsible fire suppression agency may conduct fire investigations in the following categories:

a.      Intentionally set fires in Dumpsters and other refuse/garbage containers.

b.      Intentionally set fires in Newspaper collection containers

c.    Intentionally set fires in Newspaper distribution structures (Times, P.I., etc.).

d.    Intentionally set fires in Containers used for collection of clothing, etc.

e.    Intentionally set fires in abandoned vehicles with a value less than $250.

f.    And other such fires as the responsible fire department is qualified to investigate.

6.3    For investigations conducted by Fire Department personnel for the investigations noted in section 6.2 above the following recommended procedures may be followed:

a.    Notification of the King County Fire Investigation Unit <u>within 48 hours</u> ~~the following business day~~ of all fire investigations conducted by the Fire Department in accordance with Section 6.2 for all fires that were determined to be intentionally set.

b.    Examination of the fire scene to determine area, point of origin and cause

c.    Identification, protection, preservation and collection of all physical evidence for all fires that were determined to be intentionally set. Fire department personnel will assist the responsible police department patrol unit in packaging of evidence, which will then be transported by the patrol unit for storage.

d.    Preparation of a comprehensive fire investigation report using the King County Fire Investigation Unit format and, where necessary, a fire scene sketch for all fires that were determined to be intentionally set.

e.    Photographing of the fire scene should be accomplished in three (3) steps, 1) prior to disturbing any debris or other items at or near the point of origin, 2) once again during the examination and 3) at the conclusion of the examinations. Any items considered to be evidence should be shown in photographs at the time and place they were discovered and identified.

f.    Notification of the responsible police department via the police communications center where arson is suspected or confirmed.

g.    Forwarding of the fire report along with all available information obtained during the investigation and transfer of the physical evidence, where appropriate, to the Fire Investigation Unit for all fires that were determined to be intentionally set.

h.      Forwarding a copy of the photographs (or other acceptable photographic medium) and the negatives of the incident to the Fire Investigation Unit for all fires that were determined to be intentionally set.

Note:   The proper documentation of fire incidents, accidental or arson, is critical. The scene examination must provide factual information describing what, where, why, and how this fire occurred. Photographs, properly taken, will provide a picture record of the conditions on arrival, during examination, and at the conclusion. The combination will be the basis for re-construction of the fire scene, determination of important time factors and sequence of events prior to and at the time of the fire, including the fire tactics used in extinguishing the fire, an important consideration.

**4) This amendment replaces any previous amendments.**

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY

_____
King County Executive

City of _Burien_

_____
Chief Executive Officer

Approved as to Form

_____
Senior Deputy Prosecuting Attorney
for DAN SATTERBERG
King County Prosecuting Attorney

Approved as to Form

_____
City Attorney